CONCURRING IN PART AND DISSENTING IN PART
SUTTON, Circuit Judge,
concurring in part and dissenting in part. Two questions loom over every multi-plaintiff representative action: Who is representing whom? And can the one group fairly represent the other? Whether it be a class action under Civil Rule 23, a joined action under Civil Rule 20, or as here a collective action under § 216 of the Fair Labor Standards Act, 29 U.S.C. § 216(b), the only way in which representative proof of liability—evidence by some claimants to prove liability as to all—makes any sense is if the theory of liability of the testifying plaintiffs mirrors (or is at least substantially similar to) the theory of liability of the nontestifying plaintiffs. The same imperative exists at the damages stage, where the trial court must match any representative evidence with a representative theory of liability and damages.
The three trial judges who handled this case (collectively as it were) did not heed these requirements. Before trial, the district court mistakenly certified this case as one collective action, not a collective action with two or three sub-classes, as the various and conflicting theories of liability required. At trial, the district court approved a method of assessing damages that violated the Seventh Amendment. After trial, the district court miscalculated damages by failing to adjust plaintiffs’ hourly wages and by using an incorrect multiplier. The majority goes part of the way to correcting these problems by reversing the district court’s damages calculation. I would go all of the way and correct the first two errors as well.
A recent Supreme Court decision confirms that we should correct these two other errors now. Tyson Foods, Inc. v. Bouaphakeo held that a jury may consider the persuasiveness of statistically adequate representative evidence only if each class member could have used that evidence in an individual action. — U.S. -, 136 S.Ct. 1036, 194 L.Ed.2d 124 (2016). That principle was not followed here, making our decision inconsistent with Tyson Foods and inconsistent with the Seventh Circuit’s resolution of the same class-action issue in a nearly identical setting. Espenscheid v. DirectSat USA LLC, 705 F.3d 770 (7th Cir. 2013). If we needed any other hints that we have strayed, that came when the Supreme Court vacated our first decision in this case and remanded the controversy to us for reconsideration in light of Tyson Foods. I don’t doubt that my colleagues have reconsidered their position, but I do doubt that they have correctly interpreted Tyson Foods and the Court’s other opinions in this area. For these reasons and those elaborated below, I must respectfully dissent.
Collective-action certification. The Fair Labor Standards Act permits employees to bring lawsuits on behalf of “themselves and other employees similarly situated.” 29 U.S.C. § 216(b). To determine whether plaintiffs are “similarly situated,” we look to (1) “the factual and employment settings of the individual[ ] plaintiffs,” (2) “the different defenses to which the plaintiffs may be subject,” and (3) “the degree of fairness and procedural impact of certifying the action as a collective action,” *417 among other considerations. O’Brien v. Ed Donnelly Enters., 575 F.3d 567, 584 (6th Cir. 2009) (quotation omitted), abrogated on other grounds by Campbell-Ewald Co. v. Gomez, — U.S.-, 136 S.Ct. 663, 193 L.Ed.2d 571 (2016). Helpful as this checklist may be, it should not obscure the core inquiry: Are plaintiffs similarly situated such that their claims of liability and damages can be tried on a class-wide and representative basis? 7B Charles Alan Wright et al., Federal Practice and Procedure § 1807 (3d ed. 2005).
That is where the plaintiffs fall short. They claim that the defendants violated the Fair Labor Standards Act in three distinct ways: (1) by falsifying employees’ timesheets; (2) by instructing employees to underreport their hours; and (3) by creating incentives for employees to underre-port by rewarding “productiv[ity]” and scheduling fewer shifts for those who worked too many hours. R. 200 at 8. The problem with the plaintiffs’ approach is that a jury could accept some of their theories of liability while rejecting others, and yet the verdict form gave the jury only an all-or-nothing-at-all option. Assume that, as plaintiffs allege, supervisors at a certain subset of the defendants’ offices directed employees to underreport (which violates the FLSA), while supervisors at a distinct subset of offices merely urged employees to be more efficient (which normally will not violate the FLSA). See Davis v. Food Lion, 792 F.2d 1274, 1275-78 (4th Cir. 1986); Brumbelow v. Quality Mills, Inc., 462 F.2d 1324, 1327 (5th Cir. 1972). A jury could decide that statutory violations occurred at the first group of offices but not the second (perhaps because the calls for efficiency did not rise to the level of a statutory violation, perhaps because the plaintiffs did not present enough evidence to conclude that supervisors pressured their employees to underreport, or perhaps because the only pressure—to be efficient—was self-induced and not a violation at all). What, then, is the jury tasked with delivering a class-wide verdict to do? It must say either that the defendants are liable as to the entire class or that the defendants are liable as to no one—when the truth lies somewhere in the middle. Just as it would be unfair to impose class-wide liability for all 296 employees based on the “representative” testimony that some supervisors directed employees not to report their hours, so it would be unfair to deny class-wide liability based on the “representative” testimony that some supervisors merely urged employees to be more efficient. See Tyson Foods, 136 S.Ct. at 1046-47.
The evidence at trial illustrates the problem. Start with Richard Hunt, who said he was instructed “to dock an hour for lunch whether [he] took it or not.” R. 456 at 125. Compare him to Paul Crossan, who testified that he underreported his time “because [he] wanted more jobs for more money for [him]self,” thinking he would not be scheduled for extra shifts if he recorded too many hours. R. 448 at 77. Then compare them both to Stephen Fischer, who said he was instructed to underreport his hours on some occasions, was told to over-report his hours on other occasions, and in still other cases underre-ported because he wanted to “be routed daily and not miss any work.” R. 456 at 78. With so many variables in play—different employees offering different testimony about different types of violations—how could a jury fairly assess liability on a class-wide, one-size-fits-all basis? I for one do not see how it could be done.
The Seventh Circuit recently explained how all of this should work in its unanimous opinion in Espenscheid. The case not only arose in the same industry and not only concerned the same worker-incentive plans, but it also involved the same defen *418 dant in this case. Espenscheid, 705 F.3d at 772-73. Now that is an apt use of the term similarly situated. In denying certification, Judge Posner explained the “complication presented by a worker who underreported his time, but did so ... not under pressure by [the defendant] but because he wanted to impress the company with his efficiency.” Id. at 774. The problem, as in this case, was that some plaintiffs were instructed to underreport; others underre-ported to meet the company’s efficiency goals; and still others alleged that, while they recorded their time correctly, the company miscalculated their wages. Id. at 773-74; see Espenscheid v. DirectSat USA, LLC, No. 09-cv-625-bbc, 2011 WL 2009967, at *2 (W.D. Wis. May 23, 2011), amended by 2011 WL 2132975 (W.D. Wis. May 27, 2011). Because the plaintiffs offered no way to “distinguish ... benign underre-porting from unlawful conduct by [the defendant]”—and no other way to prove their multiple, conflicting theories of liability on an all-or-nothing class-wide basis— the Seventh Circuit refused to let them proceed collectively. 705 F.3d at 774.
The court also worried that, because each employee did not perform the same tasks, they were not sufficiently similar to permit a class-wide determination of liability or damages, id. at 773; that assessing damages would require a “separate eviden-tiary hearing[]” for each member of the class, id.; that the plaintiffs’ plan to use “representative” proof with their handpicked employees would not work because the various theories of liability made it impossible to have representative employees in a single class, id. at 774; and that “the experience of a small, unrepresentative sample” of testifying workers could not support “an inference about the work time of’ the remaining plaintiffs, id. at 775. Although the district court had proposed to divide the employees into three subclasses, “corresponding to the three types of violation[s]” alleged, plaintiffs’ counsel opposed the court’s plan and “refus[ed] to suggest a feasible alternative, including a feasible method of determining damages.” Id. at 775-76. We could adopt the Seventh Circuit’s opinion as our own in this case, since it highlights precisely the same problems that afflicted the plaintiffs’ trial plan. Because the employees here did not offer a “feasible method of determining” liability and damages, the district court should have decertified their case. In the last analysis, the Seventh Circuit’s decision respects the lessons of Tyson Foods, 136 S.Ct. at 1048-49, while our decision with respect does not.
All of this does not mean that a collective action was not an option in our case. It means only that plaintiffs should have accounted for their distinct theories by dividing themselves into sub-classes, one corresponding to each theory of liability under the statute—and indeed under their own trial plan. That is a tried and true method of collective-action representation, and nothing prevented plaintiffs from using it here.
The plaintiffs offer two reasons for concluding that their trial plan worked, even without sub-classes. First, they argue that they were subject to a “unified” company-wide “time-shaving policy” and that their trial plan enabled them to prove this policy’s existence on a class-wide basis. Appel-lees’ Br. 41. But what was the relevant policy? Was it that supervisors should alter employees’ timesheets? That they should instruct employees to underreport their hours? That they should subtly encourage employees to underreport by urging them to be efficient? The plaintiffs define the company-wide “policy” at such a lofty level of generality that it encompasses multiple policies, each one corresponding to a different type of statutory violation and some to no violation at all. The *419 FLSA does not bar “benign underreport-ing” where workers try “to impress the company with [their] efficiency in the hope of obtaining a promotion or maybe a better job elsewhere—or just to avoid being laid off.” Espenscheid, 705 F.3d at 774. Nor does it violate the FLSA to reduce an employee’s amount of work to avoid increasing overtime costs. See 29 C.F.R. § 785.13; see also U.S. Dep’t of Labor v. Cole Enters., Inc., 62 F.3d 775, 779-80 (6th Cir. 1995); Kellar v. Summit Seating Inc., 664 F.3d 169, 177 (7th Cir. 2011). Yet what purports to link the plaintiffs’ claims (cognizable and non-cognizable alike) is merely the theory—at a vertigo-inducing height of generality—that the defendants violated the overtime provisions of the FLSA. A company-wide “time-shaving” policy is lawyer talk for a company-wide policy of violating the FLSA. That does not do the trick. And most assuredly it does not do the trick when one of the theories does not , even violate the FLSA.
The majority worries that, by requiring sub-classes to litigate the relevant policies, my approach would limit liability to doh-ning-and-doffing cases. But those are not the only types of cases in which a company-wide policy—in the singular—permits class-wide resolution of liability and damages. Imagine that FTS and UniTek, rather than employing different practices in different offices, told supervisors at every location to dock the pay of employees who worked at least fifty hours; or declined to pay employees for compensable commuting time; or stated that technicians in each office should not be paid for their lunch break, even if they worked through it; or used punch-in clocks that systematically under-recorded employees’ time. The plaintiffs in each of these eases could prove liability and damages on a class-wide basis, which means they could use the collective-action device to litigate their claims. See Tyson Foods, 136 S.Ct. at 1042-43. But if, as here, the company employs multiple policies, as FTS and UniTek allegedly did, the plaintiffs must bring separate actions or prove violations using sub-classes (or any other trial plan that permits class-wide adjudication). The majority warns that my approach “would compel employees to bring a separate collective action ... for unreported work required by an employer before clocking in, and another for work required after clocking out.” Supra at 403. But of course that “level of granularity,” id. at 403, is not required, and crying wolf won’t make it so. All that’s required is an approach that allows plaintiffs to litigate their claims collectively only when they can prove their claims collectively.
Second, the plaintiffs argue that the jury could assess class-wide liability by relying on “representative” proof. They note that, before trial, the parties agreed to take discovery on a “sample” of fifty employees—forty chosen by the plaintiffs, ten by the defendants. R. 249-1 at 2. The plaintiffs called seventeen of those employees to testify at trial. This representative testimony, say the plaintiffs, gave the jury enough information to reach a class-wide verdict, which means the employees were sufficiently similar to permit collective-action certification and collective-action resolution.
That representative proof works in some cases does not mean it works in all cases. Tyson Foods, 136 S.Ct. at 1048. The question—always—is who can fairly represent whom. Id. at 1047-48. If the proof shows systematic underreporting by the employer of, say, the time it takes to don and doff the same protective clothing—giving the same type of workers credit for three minutes when the proof shows it takes seven minutes—representative proof works just fine. In that setting, there is evidence about how long it takes workers to don *420 and doff and proof that the same deficiency was applied to all plaintiffs. But I am skeptical, indeed hard pressed to believe, that plaintiffs who allege one theory of liability (e.g., the company altered my timesheets) can testify on behalf of those who allege another (e.g., I underreported my time because my supervisor directed me to) or still another (e.g., I altered my time because the company urged me to be efficient). Plaintiffs who were told to un-derreport, for example, tell us very little about plaintiffs at different offices, working under different supervisors, who un-derreported based on efforts to improve efficiency. That is why the majority goes astray when it suggests that “it is enough that technicians testified as to each means of enforcement of the common, FLSA-vio-lating policy.” Supra at 409. The question is not whether each “means of enforcement” was represented; it is whether each means of enforcement was represented in proportion to its actual employment by FTS and UniTek across the entire class— something that the plaintiffs never attempted to prove.
The Supreme Court’s intervening decision in Tyson Foods, of which the district court did not have the benefit, confirms all of this and more. Not all inferences drawn from representative evidence, it makes clear, suffice to establish class-wide liability or damages. 136 S.Ct. at 1048. “Representative evidence that is statistically inadequate or based on implausible assumptions could not lead to a fair or accurate estimate of the uncompensated hours an employee has worked.” Id. at 1048-49. “If the sample could have sustained a reasonable jury finding as to hours worked in each employee’s individual action,” for example, “that sample is a permissible means of establishing the employees’ hours worked in a class action.” Id. at 1046-47. By contrast, a sample that fails to account for the various theories of liability for employees working at different locations under different supervisors is exactly the sort of representative evidence that fails to establish class-wide liability. Drawing inferences from such nominally representative evidence is neither reasonable nor just.
Tyson Foods, it is true, is a different case with different facts. Most cases are. And for that reason, the court is correct to say that Tyson Foods does not “compel” us to change our earlier decision. Supra at 400. But that analysis answers the wrong question. The Court does not enter “GVRs”—orders granting the petition for a writ of certiorari and vacating the lower court decision for reconsideration in light of intervening authority—only when new authority compels us to rule differently. As often as not, GVRs are used when intervening authority suggests a better answer may exist. Just so here, as the Seventh Circuit has already concluded.
Does anyone doubt how this case would come out if the roles were reversed—if most of the testifying plaintiffs underre-ported on their own while only a few were told to do so? We would hesitate, I suspect, to say that the testifying employees were “representative” of their nontestify-ing peers, especially if the jury returned a verdict for the defendants. What is sauce for one, however, presumably should be sauce for the other, making the district court’s certification order perilous for defendants and plaintiffs alike. No doubt, collective actions permit plaintiffs to rely on representative proof. But that proof must be representative—and here plaintiffs’ own evidence demonstrates that it was not remotely representative. See Tyson Foods, 136 S.Ct. at 1048; Espenscheid, 705 F.3d at 774; see also Sec’y of Labor v. DeSisto, 929 F.2d 789, 793-94 (1st Cir. 1991); Reich v. S. Md. Hosp., Inc., 43 F.3d 949, 952 (4th Cir. 1995).
*421 The plaintiffs claim that Anderson v. Mt. Clemens Pottery Co. permits this trial plan. See 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). But that is a case about damages, not liability. See Tyson Foods, 136 S.Ct. at 1047. Mt. Clemens Pottery holds that, after an employee has shown that he “performed work and has not been paid in accordance with the” FLSA, he may “show the amount and extent of that work as a matter of just and reasonable inference.” 328 U.S. at 687-88, 66 S.Ct. 1187. The “just and reasonable inference” rule, in other words, comes into play only when the “fact of damages” is “certain” but the “amount of damages” is unclear. Id. at 688, 66 S.Ct. 1187. As O’Brien explains, “Mt. Clemens Pottery and its progeny do not lessen the standard of proof for showing that a FLSA violation occurred.” 575 F.3d at 602; see also Tyson Foods, 136 S. Ct. at 1048—49; Shultz v. Tarheel Coals, Inc., 417 F.2d 583, 584 (6th Cir. 1969) (per curiam); Porter v. Leventhal, 160 F.2d 52, 58 (2d Cir. 1946); Kemmerer v. ICI Ams. Inc., 70 F.3d 281, 290 (3d Cir. 1995); Brown v. Family Dollar Stores of Ind., LP, 534 F.3d 593, 594-95 (7th Cir. 2008); Carmody v. Kansas City Bd. of Police Comm’rs, 713 F.3d 401, 406 (8th Cir. 2013); Alvarez v. IPB, Inc., 339 F.3d 894, 914-15 (9th Cir. 2003). The case thus provides no support for the plaintiffs’ claim that they can show liability under a “relaxed” standard of proof. Appellees’ Br. 39.
The plaintiffs counter that the defendants agreed to representative discovery, claiming that this means they necessarily agreed to representative proof at trial. But to take the one step does not require the other. The only way to determine whether one group of plaintiffs is representative of another is to gather information about both groups, typically by conducting discovery. When the defendants, after taking depositions, learned that the selected employees were not representative of their peers, they objected to the plaintiffs’ plan to use representative proof at trial. Then they objected to it three more times. We have no right to penalize them for failing to raise this objection before discovery when the targeted problem did not materialize until after discovery was complete. Put another way, there is a difference between alleging a uniform policy of un-derreporting and proving one. Once discovery showed there was no uniform policy, the defendants properly objected to representative proof. See Tyson Foods, 136 S.Ct. at 1048-49.
The plaintiffs lean on O’Brien v. Ed Donnelly Enterprises to overcome these problems but it cannot bear the weight. 575 F.3d 567 (6th Cir. 2009). O’Brien said' that plaintiffs are similarly situated when “their claims [are] unified by common theories of defendants’ statutory violations, even if the proofs of these theories are inevitably individualized and distinct.” Id. at 585. But O’Brien’s point was that, if plaintiffs offer a trial plan that enables them to prove their case on a class-wide basis, the court should permit the suit to proceed as a collective action. Such a trial plan, in some cases, may involve “individualized” presentations of proof; in other cases, representative proof may suffice. Id. But in all cases, plaintiffs must offer some reasoned method for the jury to assess class-wide liability—and that is just what the plaintiffs failed to do here. See Tyson Foods, 136 S.Ct. at 1048-49. As for O’Brien’s holding, it was that the opt-in plaintiff was not similarly situated to the other plaintiffs, “because she failed to allege that she suffered from” the “unlawful practice[s]” endured by those employees. O’Brien, 575 F.3d at 586. Just so here, where the plaintiffs failed to offer a means of proving that they suffered from “unlawful practiee[s]” on a class-wide basis.
*422 Finally, the plaintiffs (and the majority) try to distinguish this case from the Seventh Circuit’s decision in Espenscheid. It is true that the Seventh Circuit applies the Rule 23 class-action standard to assess whether plaintiffs are “similarly situated” and that our circuit has rejected Rule 23(b)(3)’s “predominance” inquiry as an element of the “similarly situated” analysis. Compare Espenscheid, 705 F.3d at 772, with O’Brien, 575 F.3d at 584-85. But that makes no difference. Under both the Seventh Circuit’s approach and our own, one way for plaintiffs to satisfy the “similarly situated” inquiry is to allege “common theories” of liability that can be proved on a class-wide basis. See O’Brien, 575 F.3d at 585. That is exactly what the Seventh Circuit found to be missing when it held that the Espenscheid plaintiffs failed to distinguish “benign underreporting from unlawful conduct.” 705 F.3d at 774. And that is exactly what is missing here. The majority also notes that Espenscheid involved a larger group of plaintiffs than this case. But that had no bearing on the Seventh Circuit’s analysis. Nor could it. Whether the collective action consisted of twenty employees or two thousand, the problem was that those employees could not prove class-wide liability—and the same reasoning applies to the class of two-hundred-plus plaintiffs today. An error does not become harmless because it affects “just” 200 people or “just” two companies.
Seventh Amendment. If class-wide liability turns on non-representative proof, that skews the liability finding. And it should surprise no one when a skewed liability determination leads to a skewed damages calculation. So it happened in this case.
The majority to its credit corrects one problem with the damages calculation. I would correct the other. The plaintiffs provided no evidence from which the jury (or, alas, the court) could conclude that the testifying plaintiffs failed to record a comparable number of hours on their time-sheets as their non-testifying peers. The district court nonetheless adopted a trial procedure that assumed that each of the testifying and non-testifying employees was similarly situated for purposes of calculating damages. That procedure not only ignored the non-representative nature of the proof, but it also violated the Seventh Amendment. See Tyson Foods, 136 S.Ct. at 1049.
Here’s how the district court calculated damages: When the jury returned a verdict for the plaintiffs, it identified the average number of weekly hours that each of the seventeen testifying employees had worked but had not recorded on their timesheets. The court then averaged together the number of unrecorded hours for each testifying employee, assumed that this value was also the average number of unrecorded hours for each of the 279 non-testifying employees, and awarded damages to the class as a whole.
The Seventh Amendment bars this judge-run, average-of-averages approach. “[N]o fact tried by a jury,” the Amendment reads, “shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.” U.S. Const, amend. VII. That means a court may not “substitute] its own estimate of the amount of damages which the plaintiff ought to have reeovered[ ] to enter an absolute judgment for any other sum than that assessed by the jury.” Lulaj v. Wackenhut Corp., 512 F.3d 760, 766 (6th Cir. 2008) (quotation omitted). Yet that is just what the court did. The jury awarded damages to the seventeen testifying plaintiffs, but the court—on its own and without any jury findings—extrapolated that damages award to the remaining 279 plaintiffs.
Tyson Foods confirms the jury’s starring role in determining damages. “Once a *423 district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury.” Tyson Foods, 136 S.Ct. at 1049. “Reasonable minds may differ as to whether the average time ... calculated ... is probative as to the time actually worked by each employee.” Id. But “[rjesolving that question ... is the near-exclusive province of the jury,” not the judge. Id. The jury in this case may not have thought it appropriate to extrapolate the damages award to the remaining 279 plaintiffs. Indeed, the jury in Tyson Foods more than halved the damages recommended by the expert in that case. Id. at 1044.
The plaintiffs defend this procedure by noting that a court may “render judgment as a matter of law as to some portion of a jury award if it is compelled by a legal rule or if there can be no genuine issue as to the correct calculation of damages.” Lulaj, 512 F.3d at 766. But the district court did not award damages based on a legal conclusion; it did so based on its finding that the non-testifying plaintiffs failed to record the same number of hours, on average, as their testifying peers. That is a factual funding about the number of hours worked by each plaintiff. And the Seventh Amendment means that a jury, not a judge, must make that finding. See Tyson Foods, 136 S.Ct. at 1049.
The majority portrays the district court’s damages determination as a matter of “arithmetic,” a “formulaic or mathematical calculation.” Supra at 414. How could that be? There was no finding by the jury about the overtime hours worked by the non-testifying employees and thus no basis for the judge to do the math or apply a formula. Imagine that ten plaintiffs bring a lawsuit. The court gives the jury a verdict form, listing the names of five plaintiffs and asking the jury to write down the amount of damages those plaintiffs should receive. After the jury does so, the judge decides that the remaining five plaintiffs are similar to their peers and decides they should receive damages too, all in the absence of any finding by the jury about the similarity of the two classes of plaintiffs. It then doubles the jury’s award and gives damages to all ten plaintiffs. I have little doubt we would find a Seventh Amendment violation, and the majority says nothing to suggest otherwise. See Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry, 494 U.S. 558, 570, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990); Wallace v. FedEx Corp., 764 F.3d 571, 591-94 (6th Cir. 2014). That conclusion should not change simply because this case arises in the collective-action context, where the “estimated average approach” is the accepted practice. The missing ingredient is that the jury, not the judge, must still determine the “estimated average” that each plaintiff should receive. And no court to my knowledge— either in the collective-action context or outside of it—has endorsed a procedure by which the jury awards damages to testifying plaintiffs while the judge awards damages to their non-testifying counterparts with no finding from the jury as to the latter group.
Nor did the district court cure the problem when it instructed the jury that non-testifying plaintiffs would be “deemed by inference to be entitled to overtime compensation.” R. 463 at 28. This instruction told the jury only that, if it found liability with respect to the testifying plaintiffs, it also was finding liability with respect to the non-testifying plaintiffs. The court did not inform the jury that its damages calculations would be averaged together to make a class-wide finding. Nor did the court charge the jury with determining the estimated average that each plaintiff should receive. All the instructions did, in effect, was tell the jury that the judge would calculate damages. But it should go *424 ■without saying that a court cannot correct a Seventh Amendment violation by informing the jury that a Seventh Amendment violation is about to occur.
For the same reason, Mt. Clemens Pottery has nothing to do with this case. It is not a Seventh Amendment case. It did not permit a judge, rather than a jury, to decide whether the damages of the testifying and non-testifying employees were similar and thus could be assessed on an “estimated average approach.” And it involved compensation for employees’ preliminary work activities, which took roughly the same amount of time for each employee to perform. 328 U.S. at 690-93, 66 S.Ct. 1187. The jury in today’s case, however, found that the number of unrecorded hours varied widely among the testifying technicians—from a low of eight hours per week to a high of twenty-four, with considerable variation in between. This range of evidence increased the risk of under-compensation for employees who worked the most hours (and over-compensation for those who worked the fewest) in a way that Mt. Clemens Pottery never needed to confront. And that risk of course heightens the importance of keeping the damages determination where it belongs—with the jury, which is best equipped to undertake the intricate fact-finding required when the employees’ unrecorded hours span so broadly.
Herman v. Palo Group Foster Home, Inc., 183 F.3d 468 (6th Cir. 1999), is of a piece. It said that the Mt. Clemens Pottery framework enables juries to find damages “as a matter of just and reasonable inference” when employers do not keep adequate records of their employees’ time. Id. at 472. Nowhere does Herman endorse the procedure used in this case, which permitted the court to assume (not even infer) that all employees failed to record the same number of hours on their timesheets.
The majority claims in the alternative that the defendants forfeited their claim to a jury trial on damages. Not true. The defendants opposed the district court’s ruling that the court could calculate damages, and they reiterated their objections at a post-trial status conference. Consistent with these objections, the district judge did not decide that defendants forfeited the point. He instead explained he was “at a little bit of a loss” because he had not tried the case and only “now” “realize[d]” that a “residual issue” remained. R. 444 at 6. In response, the district court offered to call a second jury to calculate damages, and asked the defendants what steps would be “appropriate[J” Id. at 6-7. Counsel responded, “[W]e think the only thing ... that’s left and that is appropriate is an entry of judgment ... either for the defense or liability for plaintiffs ... with zero damages.” Id. at 7. “[P]art of our position,” counsel concluded, “is to be clear for any type of post-trial appellate record” that the defendants were “not waiving ... or changing their position.” Id. at 19-20. Nowhere in this exchange do the defendants forfeit their Seventh Amendment argument; at times they indeed reaffirm it. Of course, even if the defendants had forfeited or for that matter waived their right to a jury trial (which they did not), the appropriate response would have been to conduct a bench trial on damages, not to impose damages as a matter of law with no finding by anyone—judge or jury—about the right amount. Cf. Singer v. United States, 380 U.S. 24, 26, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965).
[[Image here]]
It is not difficult to imagine how this case could have gone differently. The plaintiffs could have organized themselves into sub-classes, one corresponding to each type of alleged statutory violation. See, e.g., Fravel v. County of Lake, No. 2:07 cv *425 253, 2008 WL 2704744, at *3-4 (N.D. Ind. July 7, 2008). Or they could have complained to the Department of Labor, which may seek damages on the employees’ behalf. See 29 U.S.C. § 216(c); Espensckeid, 705 F.3d at 776. But the plaintiffs did not take either route. Because they did not do so—because they proposed a trial plan that violated both statutory and constitutional requirements—we should remand this case and allow them to propose a new procedure that permits reasoned and fair adjudication of their representative claims. See Tyson Foods, 136 S.Ct. at 1048-49.
The majority seeing things differently, I respectfully dissent.